IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

BRENDA JEAN BOYLE,

       Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,

       Defendant.

No. C15-2043

REPORT AND RECOMMENDATION

---

## TABLE OF CONTENTS

I.    *INTRODUCTION* ........................................ 2

II.   *PROCEDURAL BACKGROUND* ........................... 2

III.  *PRINCIPLES OF REVIEW* ............................... 3

IV.  *FACTS* ................................................ 5
    A.   *Boyle's Education and Employment Background* ......... 5
    B.   *Administrative Hearing Testimony* .................... 5
        1.   *Boyle's Testimony* ............................. 5
        2.   *Vocational Expert Testimony* .................... 7
    C.   *Boyle's Medical History* ............................. 8

V.   *CONCLUSIONS OF LAW* ............................... 10
    A.   *ALJ's Disability Determination* ...................... 10
    B.   *Objection Raised By Claimant* ...................... 13
        1.   *Credibility Determination* ..................... 13
        2.   *RFC Assessment and Hypothetical Question* ........... 22

VI.  *CONCLUSION* ........................................ 25

VII. *RECOMMENDATION* .................................. 25

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 4) filed by Plaintiff Brenda Jean Boyle on June 9, 2015, requesting judicial review of the Social Security Commissioner's decision to deny her application for Title II disability insurance benefits. Boyle asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits. In the alternative, Boyle requests the Court to remand this matter for further proceedings.

## II. PROCEDURAL BACKGROUND

On February 1, 2012, Boyle applied for disability insurance benefits.[1] In her application, Boyle alleged an inability to work since February 28, 2010 due to anxiety, depression, back injury, right knee injury, overactive bladder, asthma, and seizures. Boyle's application was denied on April 24, 2012. On July 30, 2012, her application was denied on reconsideration. On July 26, 2013, Boyle appeared via video conference with her attorney before Administrative Law Judge ("ALJ") Tom Andrews for an administrative hearing.[2] Boyle and vocational expert Vanessa May testified at the hearing. In a decision dated October 28, 2013, the ALJ denied Boyle's claim. The ALJ determined that Boyle was not disabled and not entitled to disability insurance benefits because she was functionally capable of performing work that exists in significant numbers in the national economy. Boyle appealed the ALJ's decision. On April 24, 2015, the Appeals Council denied Boyle's request for review. Consequently, the ALJ's October 28, 2013 decision was adopted as the Commissioner's final decision.

---

[1] Boyle first applied for disability benefits on October 13, 2010. The application was denied on January 27, 2011. Boyle did not seek reconsideration or appeal the denial of this application.

[2] At the hearing, Boyle was represented by attorney Mark B. Anderson. On appeal, Boyle is represented by attorney James P. Moriarty.

On June 9, 2015, Boyle filed this action for judicial review. The Commissioner filed an Answer on September 11, 2015. On November 11, 2015, Boyle filed a brief arguing that there is not substantial evidence in the record to support the ALJ's finding that she is not disabled and that she is functionally capable of performing other work that exists in significant numbers in the national economy. On January 8, 2016, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On January 18, 2016, Boyle filed a reply brief. On January 19, 2016, Chief Judge Linda R. Reade referred this matter to a magistrate judge for issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

### III.  PRINCIPLES OF REVIEW

The Commissioner's final determination not to award disability insurance benefits following an administrative hearing is subject to judicial review. 42 U.S.C. § 405(g). The Court has the authority to "enter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." *Id*. "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id*.

The Court "'must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole.'" *Bernard v. Colvin*, 774 F.3d 482, 486 (8th Cir. 2014) (quoting *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006)). Substantial evidence is defined as less than a preponderance of the evidence, but is relevant evidence a "'reasonable mind would find adequate to support the commissioner's conclusion.'" *Grable v. Colvin*, 770 F.3d 1196, 1201 (8th Cir. 2014) (quoting *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2011)).

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not

only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Draper v. Colvin*, 779 F.3d 556, 559 (8th Cir. 2015) ("'If substantial evidence supports the Commissioner's conclusions, th[e] court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome.' *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007)."); *Cline v. Colvin*, 771 F.3d 1098, 1102 (8th Cir. 2014) ("'As long as substantial evidence in the record supports the Commissioner's decision, [the court] may

4

not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently.' *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).").

## IV. FACTS

### A. Boyle's Education and Employment Background

Boyle was born in 1968. She completed the ninth grade in school. While in school, she was not enrolled in special education courses. Later she took courses and passed tests to be a certified nurse aide. In the past, Boyle worked as an assembler, nurse aide, and meat salter.

### B. Administrative Hearing Testimony

### 1. Boyle's Testimony

At the administrative hearing, Boyle's attorney began his questioning by inquiring whether her injured ankle made standing difficult. Boyle replied that she had trouble standing for more than 10 to 15 minutes at one time. Next, Boyle's attorney inquired about Boyle's ability to sit. Boyle stated she can sit for about 10 minutes before needing to get up and move around. Boyle also testified walking was very difficult for her, and she wore a brace on her left ankle. Boyle indicated she was limited to lifting no more than 25 pounds. Boyle's attorney concluded by asking Boyle about her daily activities:

> Q: With regard to cooking at your home, who does the cooking?
> A: My husband.
> Q: Do you do your grocery shopping by yourself?
> A: No. I take my sister with me.
> Q: How far is the grocery store?
> A: Four blocks.
> Q: Are you able to walk that distance?
> A: I am able to walk a couple of blocks. When I go to the grocery store, my sister is with me at the time. I hang onto the grocery cart, and my sister gets the groceries, carries it up and helps me also with housework.

Q:     Are you able to bathe yourself?
A:     I cannot take a shower. I take a bath with a railing that was put in for me to get up out of the tub.
Q:     Why do you need the bar?
A:     My back pain and my ankle pain.

(Administrative Record at 43-44.)

The ALJ also questioned Boyle. The ALJ inquired what Boyle believed was her most significant health problem. Boyle replied pain in her low back and left ankle are her greatest heath problems. Boyle stated that movement in her back and ankle makes the pain worse. Boyle also testified that medication is not helpful in treating her pain, and her medication makes her tired and nauseous. Furthermore, Boyle testified that since injuring her back and ankle, and being unable to do much as a result of the pain, she has developed anxiety and depression.

Next, the ALJ asked Boyle to describe her typical day. Boyle stated a typical day consists primarily of watching television and resting. The ALJ and Boyle engaged in the following colloquy regarding her ability to work:

Q:     Is there any sort of job that you could see yourself being successful at, if someone would give you an opportunity to do them?
A:     No, Your Honor.
Q:     Is there any sort of sitting job or anything of that nature that you've thought of that you think you might be able to succeed at?
A:     No, Your Honor. The medication that I'm on at this time makes me really tired. I can't sit [for a] very long period of time. If I am in pain, I would have to lay down, and -- to relieve the pain.

(Administrative Record at 56-57.) Boyle concluded that she is unable to work because "I'm in pain. Constant pain everyday."[3]

_____

[3] Administrative Record at 58.

## 2.    *Vocational Expert Testimony*

At the hearing, the ALJ provided vocational expert Vanessa May with a hypothetical for an individual who:

> should need no more than occasionally to climb ladders, ropes or scaffolds, ramps or stairs, stoop, crouch or balance, and should need no more than occasionally to kneel or crawl.
>
> In addition, our hypothetical individual should avoid concentrated exposure to extremes of heat or cold or humidity and should avoid even moderate exposure to unprotected heights or hazardous machinery.

(Administrative Record at 61.) The vocational expert testified that under such limitations, Boyle would be unable to perform her past relevant work, but could perform the following jobs: (1) personal attendant, (2) companion, and (3) office helper. Adding to his first hypothetical, the ALJ asked:

> Q:    . . . our hypothetical individual should also have a position that required no more than occasional changes in the work setting and no more than frequent use of simple work place judgment and that our hypothetical individual should also be in a position that would be classified as either SVP level one, two, three or four, would that have any impact on any of the jobs that you just described?
>
> A:    I believe they would still be available, Your Honor.
>
> Q:    And if we had a hypothetical individual and we could anticipate that they might be off task or working at a slow pace perhaps 20 percent of any given workday, would that have any impact on your opinion as the employability of our hypothetical individual?
>
> A:    Yes.  They would not be competitive, Your Honor.

(Administrative Record at 62-63.)

## C. *Boyle's Medical History*

On January 3, 2011, Boyle was referred by Disability Determination Services ("DDS") to Dr. Carroll D. Roland, Ph.D., for a psychological evaluation. Boyle reported that she was seeking disability benefits because of two back surgeries, knee surgeries, depression, and a lifetime 40-pound lifting restriction. Boyle also reported constant back pain, rated at 7, on a scale of 1 to 10, with 10 being the greatest pain. Dr. Roland noted that Boyle's daily activities included being:

> able to shop, cook, and do light loads of laundry, light housekeeping and manage her own finances. [She] relies on her children to carry laundry baskets up and down the stairs, carry groceries and do heavy housework.

(Administrative Record at 443.) Dr. Roland administered the Beck Depression Inventory-II test. Boyle's test scores indicated severe depression, but Dr. Roland found the score "inconsistent with clinical presentation."[4] The Beck Anxiety Inventory test suggested Boyle had mild to moderate anxiety. Dr. Roland diagnosed Boyle with major depressive disorder, single episode with mild to moderate intensity, generalized anxiety disorder, asthma, and chronic back pain by self report. Dr. Roland concluded:

> [Boyle] is a 42-year-old divorced Caucasian female with a history of Generalized Anxiety Disorder and Major Depressive Disorder, single episode with moderate intensity. It is significant that [Boyle] has been able to work despite the lengthy history of affective disturbance. Memory and intellect are sufficient for entry level competitive employment.

(Administrative Record at 445.)

On January 14, 2011, Dr. Lon Olsen, Ph.D., reviewed Boyle's medical records and provided DDS with a Psychiatric Review Technique and mental residual functional capacity ("RFC") assessment for Boyle. On the Psychiatric Review Technique assessment,

---

[4] Administrative Record at 444.

Dr. Olsen diagnosed Boyle with major depressive disorder (mild to moderate) and generalized anxiety disorder. Dr. Olsen determined Boyle had the following limitations: mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Olsen determined Boyle was moderately limited in her ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, and respond accordingly to changes in the work setting. Dr. Olsen concluded Boyle "would be capable of performing 2- and 3-step activities that do not require intense concentration. She will need some support when adjusting to changes in routine."[5]

On February 27, 2011, Boyle fractured her ankle. She underwent surgery to repair her ankle on February 28. She was discharged from the hospital on March 4, 2011, and prescribed pain medication as further treatment. At her 3-month post-operation appointment, Dr. P.C. Rhee, D.O., noted:

> [Boyle] was told to be touch weightbearing until the three-month follow-up; however, she has been weightbearing as tolerated for the past three weeks, often not using a CAM boot. She states that she has minimal pain and is not taking any pain medications; she rates her pain at 3/10. She has no new neuromotor deficits. Her only complaint is of a perceived limp which is not an antalgic gait. She also wants to know when she can return back to work. No other issues or concerns.

(Administrative Record at 473.) Upon examination, Dr. Rhee found full range of motion and full strength in Boyle's injured lower extremity. Dr. Rhee concluded Boyle "is doing very well. She has clinical and radiographic findings for bony union of her unstable trimalleolar fracture. Her limp appears to be more cadence related, and she would benefit

---

[5] Id. at 462.

from some gait training."[6] Dr. Rhee recommended physical therapy for gait training as treatment.

On March 29, 2012, Boyle met with Dr. Jon D.T. Krammerer, M.D., for a disability physical. Dr. Krammerer noted Boyle:

> fractured her left ankle [in] March of 2011. She has had 3 plates and 12 screws placed; this was accomplished in the orthopedic department in Rochester Mayo. She reports 8/10 left ankle pain, by the end of the day it is 10/10. She complains of pain and swelling. Better with ice, worse with activity. She has tingling in the left ankle and she is unable to walk without pain and difficulty.

(Administrative Record at 524.) Upon examination, Dr. Krammerer found normal range of motion throughout, except for decreased flexion of the knee bilaterally. Dr. Krammerer also found decreased flexion at the hip and back. Dr. Krammerer further found 0 degrees dorsi flexion on the left ankle. Dr. Krammerer noted Boyle walks with an antalgic gait with abduction at the hip. Dr. Krammerer concluded "[i]t is difficult for her to ambulate and also the Lortab would prevent her from operating heavy machinery, driving truck, or otherwise putting herself in a situation where she may put herself or others at risk."[7]

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined Boyle is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 404.1520(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Moore v. Colvin*, 769 F.3d 987, 988 (8th Cir. 2014). The five steps an ALJ must consider are:

---

[6] Administrative Record at 473.

[7] Administrative Record at 525.

> (1) whether the claimant is currently employed; (2) whether the claimant is severely impaired; (3) whether the impairment is or approximates an impairment listed in Appendix 1; (4) whether the claimant can perform past relevant work; and, if not, (5) whether the claimant can perform any other kind of work.

*Hill v. Colvin*, 753 F.3d 798, 800 (8th Cir. 2014) (citing *King v. Astrue*, 564 F.3d 978, 979 n. 2 (8th Cir. 2009)); *see also* 20 C.F.R. § 404.1520(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant is not disabled. Fifth, the ALJ determines whether the claimant can perform other jobs in the economy. If so, the claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "'bears the burden of demonstrating an inability to return to [his] or her past relevant work.'" *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (quoting *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009)). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "'the claimant has the physical residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with [his or] her impairments and vocational factors such as age,

education, and work experience.'" *Phillips v. Astrue*, 671 F.3d 699, 702 (8th Cir. 2012) (quoting *Holley v. Massanari*, 253 F.3d 1088, 1093 (8th Cir. 2001)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 404.1545(a); *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014). The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his or] her limitations.'" *Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)); 20 C.F.R. § 404.1545.

The ALJ applied the first step of the analysis and determined Boyle had not engaged in substantial gainful activity since February 28, 2010 through March 31, 2012, her date last insured. At the second step, the ALJ concluded from the medical evidence that Boyle has the following severe impairments: depressive disorder, possible anxiety disorder, status-post ankle surgery, and status-post back surgeries. At the third step, the ALJ found Boyle did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Boyle's RFC as follows:

> through the date last insured, [Boyle] had the residual functional capacity to perform light work . . . except she should need no more than occasionally to climb ladders, ropes, scaffolds, ramps or stairs, stoop, crouch or balance, and should need no more than occasionally to kneel or crawl. She should avoid concentrated exposure to extremes of heat, cold, or humidity. She should avoid even moderate exposure to unprotected heights or hazardous machinery. She should also have a position that required not more than occasional changes in the work setting and no more than frequent use of simple workplace judgment. She should also be in a position classified as SVP 1, 2, 3, or 4.

(Administrative Record at 13.) Also at the fourth step, the ALJ determined that Boyle was unable to perform her past relevant work. At the fifth step, the ALJ determined that based

on her age, education, previous work experience, and RFC, Boyle could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded Boyle was not disabled from her alleged onset date, February 28, 2010, through her date last insured, March 31, 2012.

## B. Objection Raised By Claimant

Boyle argues the ALJ erred in two respects. First, Boyle argues the ALJ failed to properly evaluate her subjective allegations of pain and disability. Second, Boyle implicitly argues the ALJ's RFC assessment is flawed and unsupported by substantial evidence; and explicitly argues the hypothetical questions provided to the vocational expert at the administrative hearing are flawed because they are not supported by substantial evidence and do not properly set forth her credible functional limitations.

### 1. Credibility Determination

Boyle argues the ALJ failed to properly evaluate her subjective allegations of pain and disability. Boyle maintains the ALJ's credibility determination is not supported by substantial evidence, including medical evidence from treating sources. The Commissioner argues the ALJ properly considered Boyle's testimony, and properly evaluated the credibility of her subjective complaints.

When assessing a claimant's credibility, "[t]he [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). An ALJ should also consider a "a claimant's work history and the absence of objective medical evidence to support the claimant's complaints[.]" *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). The ALJ, however,

may not disregard a claimant's subjective complaints "'solely because the objective medical evidence does not fully support them.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012).

Instead, an ALJ may discount a claimant's subjective complaints "if there are inconsistencies in the record as a whole." *Wildman v. Astrue*, 596 F.3d 959, 968 ((8th Cir. 2010); *see also Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) ("The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole."). If an ALJ discounts a claimant's subjective complaints, he or she is required to "'make an express credibility determination, detailing the reasons for discounting the testimony, setting forth the inconsistencies, and discussing the Polaski factors.'" *Renstrom*, 680 F.3d at 1066; *see also Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008) (An ALJ is "required to 'detail the reasons for discrediting the testimony and set forth the inconsistencies found.' *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003)."). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001); *see also Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (providing that deference is given to an ALJ when the ALJ explicitly discredits a claimant's testimony and gives good reason for doing so); *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reasons for doing so, we will normally defer to the ALJ's credibility determination."). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Vossen v. Astrue*, 612 F.3d 1011, 1017 (8th Cir. 2010).

In his decision, the ALJ addressed Boyle's subjective allegations as follows:

> After careful consideration of the evidence, the undersigned
> finds that [Boyle's] medically determinable impairments could

reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

[Boyle] experiences some symptoms and limitations; however, the record does not fully support the severity of [her] allegations. As discussed in full detail above, the objective medical findings of record failed to support [Boyle's] allegations of disabling symptoms and limitations. It appeared that [she] had a tendency to exaggerate both her physical and mental health limitations. [Boyle] was noted during psychological evaluations as endorsing severe levels of depressive symptoms, which was not consistent with her clinical presentation. Furthermore, this was not consistent with her declining antidepressant medications. (Exhibits 3F; 9F; 11F) Furthermore, [Boyle] reported impairments, such as testifying to having rheumatoid arthritis, without any supporting medical documentation (Hearing Testimony).

As noted above, the objective physical examination findings failed to support [Boyle's] allegations of disabling back, knee and ankle pain. Notably, following a redo SI fusion procedure and a right knee injury, records failed to indicate [Boyle] sought any type of ongoing treatment. It would be expected that someone reporting such severe and limiting pain symptoms would seek ongoing medical treatment in order to improve their conditions. The fact that [she] failed to do so further erodes the credibility of her allegations. While testifying that she reported ongoing ankle pain following her surgery, treatment notes through the Mayo Clinic clearly indicated [Boyle] reported doing well following the procedure. Of note, treatment notes indicated [she] reported minimal pain to the point she no longer needed pain medications (Exhibit 8F), which appeared significantly inconsistent with her allegations and testimony. Furthermore, inconsistent with her allegations of disabling ankle pain status-post surgery, she informed her physician through Mayo that she was having minimal pain and was doing

well three months postoperatively. Podiatry treatment notes indicated rather minimal findings that were not supportive of her pain allegations (Exhibit 18F). Significantly, during a psychological evaluation, [Boyle] reported being unable to sit for longer than fifteen minutes due to pain symptoms. However, the psychologist noted that she sat for nearly an hour without any indication of pain (Exhibit 11F). These inconsistencies significantly erode the credibility of [Boyle's] allegations.

Mentally, treatment notes indicated [Boyle] generally did well on medications. In function reports submitted to the agency, she reported having some difficulties with personal care tasks; however, indicated this was due to her physical symptoms, noting she needed no reminders for such tasks. She reported preparing simple meals on a daily basis, reporting that she could not stand at the stove for very long. However, as discussed above, these allegations were not supported by the generally normal physical examination findings of record (Exhibits 8F; 16F; 18F). She reported doing some household chores, indicating she received help from family members. She reported going out a few times per week, walking or riding in a car, and having the ability to go out alone. She reported shopping in stores for food, indicating she needed to hang onto the cart while shopping and would shop with family members. Socially, she reported spending time with family, going to doctor appointments, and having no problems getting along with others. She reported being able to pay attention for a long time, which was inconsistent with her allegations in other reports, where she reported difficulties concentrating due to pain issues (See Exhibit 11E). She reported being able to follow both writing and spoken instructions, but having difficulties handling stress and changes in routine. (Exhibit 16E) These findings were incorporated into the residual functional capacity.

(Administrative Record at 22-23.)

Furthermore, while Boyle generically states that treating sources support her subjective allegations, the ALJ thoroughly and exhaustively addressed the medical evidence

and medical source opinions in this case.[8] Specifically, the ALJ addressed Boyle's medical history and the inconsistencies between her subjective allegations and the medical evidence of record, including treating source opinions as follows:

> Turning to the medical evidence, the objective findings in this case fail to provide strong support for [Boyle's] allegations of disabling symptoms and limitations. More specifically, the medical findings do not support the existence of limitations greater than the above listed residual functional capacity.

> [Boyle] alleged disability due to lower back pain, right knee pain, and left ankle pain following surgeries on the back and left ankle. However, review of the objective medical findings of record failed to support [her] allegations of disabling symptoms and limitations. Remotely, treatment records from May 2005 revealed [Boyle] had a previous sacroiliac fusion performed sometime in 1999, which did very well until an apparent falling incident in October of 2004. Based on [her] pain symptoms and radiological findings showing possible pseudoarthritis of the left sacroiliac joint and screw displacement, [Boyle] underwent a second procedure to explore the joint, remove the screw, and perform re-grafting with revision of the fusion. Of note, radiological findings following the procedure indicated a normal lumbar spine with well-maintained disc spaces. In addition, the fusion hardware was in place. Subsequently, [Boyle's] surgeon noted that MRI testing "showed that her back looked pretty good", and was without disc protrusion or spondylitic change. On further evaluation in September 2005, treatment records indicated that the redo surgery was apparently successful, in that [she] was returned to work with a restriction to "avoid lifting over 40 lbs." (Exhibit 15F)

> Subsequently, following this treatment, there was no further medical evidence that [Boyle] sought out or received any further medical treatment concerning ongoing back pain

---

[8] *See* Administrative Record at 15-21.

symptoms. During an evaluation in July 2009, [she] reported back pain radiating into the left buttock and rotating around to the anterior thigh. However, she related that she was working at Agriprocessors for four months causing aggravated pain symptoms. Physical examination findings indicated subjective tenderness to the lower lumbar spine and left sacroiliac joint with palpation; however, there were no focal neurological deficits. Significantly, [she] was informed to follow-up in one week should her symptoms not improve with medications. Notably, there was no indication that [Boyle] sought such follow-up regarding back pain symptoms. Subsequent treatment notes revealed normal physical examination findings, with [Boyle] reporting that her back pain was doing better and indicating that she had returned to working (Exhibits 1F; 2F).

Following these evaluations, treatment records revealed a rather significant gap in treatment, where [Boyle] did not seek any further medical treatment, which appeared significantly contrary to her allegations of experiencing disabling back pain since her remote surgeries. In April 2010, [Boyle] was seen in the emergency room reporting a work-related right knee injury. At this time, she reported feeling a pop in the knee while lifting a cooler onto a cart. Radiological findings in the emergency department were negative, with [Boyle] being placed in a splint and immobilizer such that she was partial weight bearing. She continued working at this time, doing work activity sitting with her leg extended. On physical evaluation in May, there was no swelling or erythema. She had some sensitivity along the anterior shin, complained of pain over the patella and reported pain with flexion and extension of the knee. Larry Barthel, M.D., thought [Boyle's] reported increased pain symptoms were due to her brace, providing her with a Toradol injection and informing her to leave the brace off and do no weight bearing for twenty-four hours. Subsequently, [Boyle] underwent evaluation with a worker's compensation provider, Kristen Heffern, ARNP. During this evaluation, [Boyle] alleged throbbing and constant right knee pain worsened with movement and standing. She reported undergoing physical therapy, however, therapy notes indicated noncompliance with

attending/making follow-up appointments. Of note, [Boyle] reported missing appointments due to having to go to work, with treatment notes indicating she continued working full[-]time but on restricted duty. [Boyle] underwent MRI testing of the knee, showing a lateral patellar dislocation with bone bruises and edema. On physical evaluation, [she] was able to move with moderate difficulty using crutches and a hinged knee brace. There was no bruising or deformity of the knee and there was crepitus and joint effusion. She reported pain with flexion, extension, range of motion, and light palpation over the medial side of the kneecap. She was informed to continue physical therapy 2-3 times per week, wear her brace and use crutches with weight bearing as tolerated, and to follow restrictions. At this time, the nurse practitioner noted restrictions including seated work only, sedentary work, working five and a half hours per day, the ability to get up as needed using crutches weight bearing, wearing her brace while up and active, and indicated she may elevate her right leg as needed for comfort. (Exhibit 1F) Significantly, however, it would appear that her right knee issues resolved, as [Boyle] did not seek any further treatment following her May 24, 2010, evaluation with the nurse practitioner, as discussed above.

[Boyle] sought no further treatment regarding her allegedly disabling pain symptoms until presenting in February 2011 after falling and fracturing her left ankle. At this time, treatment notes revealed [Boyle] was intoxicated and fell outside of a bar, fracturing her ankle, with a blood alcohol level of 294. Due to the nature of the fracture, [she] was referred to the Mayo Clinic for further treatment. Upon evaluation through the emergency department, [Boyle] was noted as combative, attempting to hit staff. Radiological findings showed evidence of the fracture, with a reduction of the ankle fracture performed in the emergency department upon admission. Furthermore, during this admission, [Boyle] was placed on Ativan for anxiety control and for alcohol withdrawal. On March 2, 2011, [Boyle] underwent open reduction and internal fixation of the left ankle fracture. Following the procedure, treatment notes

revealed [she] was doing well postoperatively, with good physical evaluation findings.

Most recently, [Boyle] underwent postsurgical orthopedic evaluation in June 2011 with Peter Rhee, D.O. Notably, during this evaluation, [she] reported noncompliance with treatment and recovery advice. Dr. Rhee noted that [Boyle] had been told to be touch weight bearing until her three-month follow-up evaluation; however, [she] reported that she had been weight bearing as tolerated and was often not using her CAM boot. Furthermore, directly contrary to her allegations and testimony, Dr. Rhee noted that [Boyle] reported minimal pain such that she was no longer taking pain medications. Her only complaint at this time surrounded a "perceived" limp; however, the orthopedist noted that she ambulated with a non-antalgic gait. On examination of the left lower extremity, there was no tenderness to palpation or erythema. Active range of motion testing showed 10/10 degrees of dorsiflexion, 30/30 degrees of flexion, and equal subtalar motion. Furthermore, the claimant had 5/5 motor strength throughout, intact sensation, and pulses were +2. Radiological testing showed intact hardware with no interval changes. Significantly, Dr. Rhee found [Boyle] was doing very well. Furthermore, [Boyle] reported that she was looking for new work and requested an updated work status report. At this time, she was given a work status report allowing clearance to start working with restrictions including, "No high impact activity. Can do stationary work. No heavy/repetitive lifting. No climbing." Of note, these restrictions applied from the period of June 8, 2011 through August 30, 2011, with the doctor noting that [Boyle] should return for further evaluation in three months for reassessment. However, there was no indication [she] followed through with these recommendations. Furthermore, while the doctor prescribed physical therapy for further treatment, there was no indication that [she] sought out this treatment as well. (Exhibits 8F; 9F)

The following month, [Boyle] established care through the Cresco Clinic with Dennis Colby, D.O. During this

evaluation, [Boyle] reported recently moving and needing refills of her Alprazolam and Lortab. She reported pain symptoms following her ankle surgery, noting that her ankle was painful and swollen. Physical examination findings were rather minimal, indicating only that the ankle was quite tender and the incisions were intact. Dr. Colby simply provided medication refills at this time. In August, [Boyle] reported ongoing ankle pain. However, she reported starting a new job working four hours a day at Alco. Once again, Dr. Colby noted no significant findings on evaluation, providing [Boyle] with another refill of her pain medication. In October, [she] saw Jon Krammerer, M.D., for refills of her medications. Physical evaluation findings showed no gross deformities of the lumbar spine and [Boyle] walked with a non-antalgic gait. Notably, at this time, [Boyle] apparently did not report any ankle pain symptoms, noting only a history of back surgeries. In following two months later, [she] reported a pain level of 7 on a scale of 10. Physical evaluation findings showed minor left ankle swelling and some tenderness over the left malleolus. It was discussed that [she] should start weaning off narcotic medications; however, even with medication usage she reported that she was "currently functioning in society", without noting any problems. (Exhibit 9F)

(Administrative Record at 15-17.)

It is clear from the ALJ's decision that he thoroughly considered and discussed Boyle's treatment history, medical history, functional restrictions, activities of daily living, work history, and use of medications in making his credibility determination. Thus, having reviewed the entire record, the Court finds that the ALJ adequately considered and addressed the *Polaski* factors in determining that Boyle's subjective allegations of disability were not credible. *See Johnson*, 240 F.3d at 1148; *see also Goff*, 421 F.3d at 791 (an ALJ is not required to explicitly discuss each *Polaski* factor, it is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective complaints); *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized

and considered. *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)."). Accordingly, because the ALJ seriously considered, but for good reasons explicitly discredited Boyle's subjective complaints, the Court will not disturb the ALJ's credibility determination. *See Johnson*, 240 F.3d at 1148. Even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 2. *RFC Assessment and Hypothetical Question*

Boyle argues implicitly that the ALJ's RFC assessment is flawed, and explicitly argues that the hypothetical questions provided to the vocational expert at the administrative hearing are also flawed. Specifically, Boyle argues the ALJ's RFC assessment and hypothetical questions to the vocational expert are incomplete because they do not properly account for all of her impairments and functional limitations. Thus, Boyle contends the ALJ's RFC assessment and hypothetical questions are not supported by substantial evidence in the record. Boyle contends this matter should be remanded for further consideration of her RFC, and to allow the ALJ to provide the vocational expert with a proper and complete hypothetical question.

When an ALJ determines that a claimant is not disabled, he or she concludes that the claimant retains the residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Beckley*, 152 F.3d at 1059. The ALJ is responsible for assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803. Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson*, 361 F.3d at 1070). While an ALJ must consider all of the relevant evidence when determining a

claimant's RFC, "the RFC is ultimately a medical question that must find at least some support in the medical evidence of record." *Casey*, 503 F.3d at 697 (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)).

Additionally, an ALJ has a duty to develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)); *see also Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) ("A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

Furthermore, hypothetical questions posed to a vocational expert, including a claimant's RFC, must set forth his or her physical and mental impairments. *Goff*, 421 F.3d at 794. "The hypothetical question must capture the concrete consequences of the claimant's deficiencies." *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001) (citing *Taylor v. Chater*, 118 F.3d 1274, 1278 (8th Cir. 1997)). The ALJ is required to include only those impairments which are substantially supported by the record as a whole. *Goose v. Apfel*, 238 F.3d 981, 985 (8th Cir. 2001); *see also Haggard v. Apfel*, 201 F.3d 591, 595 (8th Cir. 1999) ("A hypothetical question 'is sufficient if it sets forth the impairments which are accepted as true by the ALJ.' *See Davis v. Shalala*, 31 F.3d 753, 755 (8th Cir. 1994) (quoting *Roberts v. Heckler*, 783 F.2d 110, 112 (8th Cir. 1985).").

In determining Boyle's RFC, the ALJ thoroughly considered and exhaustively addressed Boyle's medical history and treatment for her complaints.[9] The ALJ concluded:

> the above residual functional capacity assessment is supported by the objective medical evidence contained in the record. Treatment notes in the record do not sustain [Boyle's] allegations of disabling symptoms. The consultative examination of [Boyle] supports the residual functional capacity as described above. . . . [Boyle] does experience some symptoms and limitations but only to the extent described in the residual functional capacity above.

(Administrative Record at 23.) The ALJ also properly considered and thoroughly discussed Boyle's subjective allegations of disability in making his overall disability determination, including determining Boyle's RFC.[10]

Therefore, having reviewed the entire record, the Court finds that the ALJ properly considered Boyle's medical records, observations of treating physicians, and Boyle's own description of her limitations in making the ALJ's RFC assessment for Boyle.[11] *See Lacroix*, 465 F.3d at 887. Furthermore, the Court finds that the ALJ's decision is based on a fully and fairly developed record. *See Cox*, 495 F.3d at 618. Because the ALJ considered the medical evidence as a whole, the Court concludes that the ALJ made a proper RFC determination based on a fully and fairly developed record. *See Guilliams*, 393 F.3d at 803; *Cox*, 495 F.3d at 618. The Court concludes that Boyle's implicit assertion that the ALJ's RFC assessment is flawed is without merit.

---

[9] *See* Administrative Record at 15-23 (providing an exhaustive and thorough discussion of Boyle's overall medical history and treatment).

[10] *See* Administrative Record at 22-23 (providing a thorough discussion of Boyle's subjective allegations of disability).

[11] *Id.* at 15-23 (providing a thorough and exhaustive discussion of the relevant evidence for making a proper RFC determination).

Similarly, having reviewed the entire record, the Court, again, finds that the ALJ thoroughly considered and discussed both the medical evidence and Boyle's testimony in determining Boyle's impairments and functional limitations.[12] The Court further determines that the ALJ's findings and conclusions are supported by substantial evidence on the record as a whole. Because the hypothetical question posed to the vocational expert by the ALJ was based on the ALJ's findings and conclusions, the Court concludes that the ALJ's hypothetical question properly included those impairments which were substantially supported by the record as a whole. *See Goose*, 238 F.3d at 985; *see also Forte v. Barnhart*, 377 F.3d 892, 897 (8th Cir. 2004) (an ALJ need only include those work-related limitations that he or she finds credible). Therefore, the ALJ's hypothetical questions were sufficient.

## VI. CONCLUSION

I find the ALJ properly determined Boyle's credibility with regard to her subjective complaints of pain and disability. I also find the ALJ considered the medical evidence as a whole, and made a proper RFC determination based on a fully and fairly developed record. The ALJ's hypothetical questions to the vocational expert were also sufficient because they properly included those impairments and functional limitations substantially supported by the record as a whole. Accordingly, I believe the ALJ's decision is supported by substantial evidence and should be affirmed.

## VII. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that the district court **AFFIRM** the final decision of the Commissioner of Social Security and enter judgment against Boyle and in favor of the Commissioner.

---

[12] *Id.*

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court.

DATED this 17th day of March, 2016.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA